UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ERIN BULFIN,                           )
                                       )
          Plaintiff,                   )
                                       )
     vs.                               )     Case No. 4:20 CV 689 JMB
                                       )
BECKY RAINWATER, RENITA HAWKINS,       )
MARYANNE WILLIS, VANESSA DURIS,        )
PHILIP WAGENKNECHT, and ST. LOUIS      )
COUNTY,                                )
                                       )
          Defendants.                  )

## MEMORANDUM and ORDER

Now pending before the Court are Defendant Philip Wagenknecht's Motion for Summary Judgment (Doc. 118), Defendants Vanessa Duris, Renita Hawkins, Becky Rainwater, Maryanne Willis, and St. Louis County's (collectively County Defendants) Motion for Summary Judgment (Doc. 125), Plaintiff Erin Bulfin's Motion for Partial Summary Judgment (Doc. 128), and Plaintiff's Motion to Strike (Doc. 201).  For the reasons set forth below, the Defendant Wagenknecht's Motion is **GRANTED in part**, the County Defendants' Motion is **GRANTED in part**, Plaintiff's Motion for Partial Summary Judgment is **DENIED**, and Plaintiff's Motion to Strike is **DENIED as moot**.

## I.    Procedural Background

On May 26, 2020, Plaintiff Erin Bulfin filed a 30-count complaint alleging federal claims pursuant to 42 U.S.C. § 1983 and state law claims related to the euthanasia of her dog, Daisy, on December 27, 2019 (Doc. 1).  She generally alleges that the individual Defendants, who are/were employees of St. Louis County Animal Care and Control during the relevant time-period, unlawfully seized Daisy, euthanized her without permission, and caused damages.  In particular,

she alleges unlawful seizure claims in violation of the Fourth Amendment to the United States Constitution (Counts I, VI, XI, XVI, XXIII)[1] and state law claims of malicious trespass to personalty (Counts II, VII, XII, XVIII, XXIV), conversion (Counts III, VIII, XIII, XX, XXV), intentional infliction of emotional distress (Counts IV, IX, XIV, XXI XXVII), and negligent infliction of emotional distress (Counts V, X, XV, XXII, XVIII) against each of the individual Defendants.  The Complaint further alleges a failure to intervene claim against Defendant Maryann Willis (Count XVII) and state law veterinary malpractice claims against Defendants Dr. Vanessa Duris and Dr. Philip Wagenknecht (Counts XIX and XXVI).  Finally, she alleges unlawful practice/procedure (Count XXIX) and failure to train/supervise (Count XXX) claims against Defendant St. Louis County.

In response to the County Defendant's Motion for Summary Judgment, Plaintiff voluntarily dismissed her failure to intervene (Count XVII), veterinary malpractice against Duris (Count XIX), and intentional infliction of emotional distress (Counts IV, IX, XIV, XXI) claims. In response to Defendant Wagenknecht's Motion for Summary Judgment, Plaintiff voluntarily dismissed her intentional and negligent infliction of emotional distress claims (Counts XXVII and XXVIII).  Therefore, the only remaining claims are her Fourth Amendment claims (Counts I, VI, XI, XVI, XXIII), state law claims of malicious trespass to personalty (Count II, VII, XII, XVIII, XXIV), conversion (Counts III, VIII, XIII, XX, XXV), negligent infliction of emotional distress against the County Defendants (Counts V, X, XV, XXII), and, veterinary malpractice against Defendant Wagenknecht (Count XXVI); and her unlawful practice/procedure (Count XXIX) and failure to train/supervise (Count XXX) claims against Defendant St. Louis County.

---

[1] Plaintiff's complaint mentions the Fourteenth Amendment in conjunction with her Fourth Amendment claim against state actors but does not allege a separate procedural or substantive due process claim (Doc. 1, pp. 20-21, 26-28, 32-34, 38-39).

## II.   **Factual Background**

The following facts are undisputed except where indicated.[2]  The Court has disregarded any purported "fact" that is unsupported by citation to the record.

During the relevant time period, Plaintiff Erin Bulfin and Edward Nea, a married, co-habiting couple who have a daughter together, adopted a dog named Daisy (County Defendant's Statement of Uncontroverted Material Facts (DF), Doc. 127,   ¶¶ 1-3, 47, 48, 49, 51).[3]   On December 26, 2019, Daisy bit their young daughter in the face, requiring medical attention (DF ¶ 4-5).  The next day, Plaintiff contacted Daisy's veterinarian to determine what to do with Daisy (DF ¶ 14).  She was informed to contact St. Louis Animal Care and Control (ACC) (DF ¶ 17).[4] When Plaintiff called ACC, she spoke to Defendant Rebecca Rainwater and informed her that Daisy had bitten her daughter (DF ¶¶ 21, 24).  While the parties have a minor dispute as to the specific content of the conversation,[5] the undisputed fact is that they talked about what options

---

[2] Plaintiff quibbles about various facts that are either immaterial or only tangentially related to the issues at hand.  She also indicates that a stated fact is undisputed but then goes on to add additional facts in an effort to fully, and oftentimes unnecessarily, flesh out the originally stated facts.  Finally, a number of stated facts are unsupported by the evidence cited.  This renders the parties' statements of uncontroverted material facts unnecessarily lengthy, complicated, and dense.  With that in mind, the Court has recited the relevant facts over which there is no actual dispute and will indicate if a relevant fact is in dispute.

[3] Defendant Wagenknecht's statement of uncontroverted material facts (Doc. 120) is practically identical to the County Defendants' statement.

[4] Like Plaintiff, Defendants interject unnecessary facts.  For example, they go into detail about previous times when Daisy bit other people and dogs (DF ¶¶ 10, 11, 12), Plaintiff's supposed request to have Daisy immediately euthanized by her veterinarian (DF ¶ 15), and Plaintiff's Facebook messages to her cousin discussing how Daisy attacked her child, how they were afraid to have the dog in their house, and that they were considering euthanasia (DF ¶ 28).

[5] The County Defendants submitted the declaration of Lisa Langeneckert, another ACC employee, who allegedly overheard the conversations between Rainwater and Plaintiff and Hawkins and Nea (Doc. 127-11).  Plaintiff seeks to strike this declaration because it is unreliable, contains inadmissible hearsay, and is inconsistent with other testimony.  That Motion to Strike (Doc. 201) is **DENIED as moot**.  As herein noted, the exact nature of the conversation between the parties is not necessary for a determination of Plaintiff's constitutional claims.  As such, it is unnecessary for the Court to determine whether the declaration is admissible and it is not relied on in this memorandum and order.

Plaintiff had and Plaintiff indicated that Nea, her husband, would bring Daisy to ACC (DF ¶ 26, Plaintiff's Statement of Uncontroverted Facts ("PF"), Doc. 129, ¶ 49).[6]

Nea brought Daisy to ACC on December 27, 2019 around 12:00 p.m. and had a conversation with Defendant Renita Hawkins, the intake clerk, who began preparing an "Intake Form"[7] and "Bite Form"[8] while speaking to him (DF ¶¶ 30, 31, 32, 38).  The parties dispute what verbal information Nea exchanged with Hawkins.

According to Hawkins, Nea insisted that Daisy be euthanized immediately without any period of quarantine (Doc. 127-4, p. 27-28; 41).  Rainwater, who was Hawkins' supervisor, then came out of her office and talked to Nea for 10 to 20 minutes (or more), explaining that typically, when an animal is surrendered, they can hold the animal for 10 days before euthanizing it (Doc. 127-4, p. 26, 48; Doc. 127-5, p. 13).  Nea nonetheless insisted that he didn't want Daisy to sit in the shelter over the weekend and that he wanted her euthanized immediately (Doc. 127-5, pp. 13, 21).  Hence, the "owner requested euthanasia" (ORE) box and various authorizations were check marked on the Intake Form by Hawkins.

According to Nea, he only spoke to Hawkins while inside the ACC building; he had no conversation or interaction with Rainwater (Doc. 127-1, p. 10).  He told Hawkins that he wanted Daisy to be quarantined for 10 days and that he may have mentioned euthanasia but only within the context of putting Daisy down if she had rabies (Doc. 127-1, p. 13, 15).

---

[6] Rainwater testified that Bulfin told her that their dog had bitten her child and they discussed various option including home quarantine, shelter quarantine, and euthanasia (Doc. 127-5, p 15).  Bulfin does not recall what Rainwater said to her or the specifics of the conversation but does recall asking if they could be with Daisy if she was euthanized and being told that she needed to bring Daisy in for a 10-day hold (Doc. 127-2, p. 13).

[7] The Intake Form is entitled "Saint Louis County Department of Public Health – Animal Care & Control." (DF ¶ 35; Doc. 127-8, pp. 1-2).

[8] The Bite Form is entitled "Saint Louis County Department of Public Health – Animal Bite/Injury Reporting Form" (Doc. 127-8, p. 3).

Plaintiff has pointed to no evidence that Rainwater heard the conversation between Hawkins and Nea and/or that she was aware that Nea verbally requested quarantine only. However, Hawkins told Rainwater that she believed Daisy should be quarantined for 10 days but Rainwater told her that they will honor an owner requested euthanasia as set forth on the Intake Form (Doc. 127-4, p. 51).   Despite this question of facts as to the exact contents of the conversation(s), Plaintiff does not dispute that "Defendant Hawkins . . . explained the process and paperwork to Edward Nea" (DF ¶ 33).[9]

After signing the Intake Form, Nea took Daisy outside of the ACC building (PF ¶ 100). ACC employee Clinton Wall then retrieved Daisy from Nea outside the shelter and Nea left the ACC parking lot (DF ¶ 39; PF ¶ 103).

While Nea interacted with Hawkins, Defendant Dr. Vanessa Duris, who was the Director of ACC, was speaking to Dr. Philip Wagenknecht, the veterinarian, who was standing outside her office (Doc. 127-7, pp. 11, 12).   After Nea left ACC, Rainwater glanced in the room and asked whether Dr. Wagenknecht had time to perform an "ORE in a bite case" (Doc. 127-5, pp. 10-11). Dr. Duris recalls someone asking Dr. Wagenknecht if he had time for one more euthanasia and Dr. Wagenknecht agreed if he could have help (Doc. 127-7, p. 11).[10]  Dr. Duris does not recall being asked or giving permission for Daisy's euthanasia (Doc. 127-1, p. 11).   However, Rainwater testified that Dr. Duris said "okay" to her request (Doc. 127-5, p. 11).   At that point, Maryanne Willis, another employee of ACC, approached the group and Rainwater asked Willis to assist Dr. Wagenknecht (Doc. 127-5, p. 12).   Willis agreed (Doc. 127-5, p. 12).   Willis then scanned Daisy's

---

[9] Bulfin states that this statement of fact is disputed but only disputes the part of the fact that states that Rainwater also explained the process and paperwork to Nea (Doc. 190/204, response to ¶ 33).

[10] Dr. Wagenknecht does not make an independent determination of whether an animal should be euthanized; he follows the direction of managers or supervisors at the ACC to euthanize an animal (Defendant Wagenknecht's Statement of Uncontroverted Material Facts (WDF), Doc. 120, ¶¶16-17).

microchip and determined that she was registered to "Erin Nea," compared the name to the name on the Intake Form and confirmed that the address on the microchip was the same address provided by Nea (DF ¶¶ 41, 42, 43).  Neither Dr. Duris, Dr. Wagenknecht, nor Willis had direct contact with Plaintiff or Nea nor is there any evidence that they were privy to any conversations Plaintiff and/or Nea had with Rainwater and/or Hawkins (DF ¶¶ 54, 56).   Daisy was subsequently euthanized (DF ¶ 46).   It is undisputed that Plaintiff came to ACC the next day and was unaware that Daisy had been euthanized.   There is no evidence that Plaintiff, herself, requested that Daisy be euthanized.

Daisy's euthanasia has been "extremely traumatic" for Plaintiff's family, especially their youngest daughter (Doc. 127-2, p. 34).  It was also "absolutely devastating" to Plaintiff and caused stress and upset, headaches, stomach problems, nausea, anxiety, and depression of unspecified duration or intensity (Doc. 127-2, p. 34-37).  However, she did not seek counseling, psychiatric or medical assistance, has not been diagnosed with any disorder or medical harm, and has not missed work as a result of Daisy's euthanasia (Doc. 127-2, p. 34-35).

**Intake Form**

ACC has only one Intake Form which is used for quarantines, owner surrenders, and euthanasia (Plaintiff's Statement of Additional Uncontroverted Material Facts (PAF), Doc. 203, ¶ 23).  The Intake Form is a two-page document containing various boxes to be checked, information about the person bringing the dog to ACC, places for a person to sign, date, and provide a Missouri Driver's License number, a description of the dog, notes, and additional information regarding vaccinations and surgery notes (Doc. 127-8, p. 1-2).  The Intake Form in this case describes Daisy, indicates she was received on 12/27/2019, that she was surrendered because of "Bite/ORE" (a "Bite Case OWNED" box is likewise checked), that Daisy's chip was registered to "Erin Nea"

with the same address as Edward Nea, and that the "Quarantine End/Date Sent to Lab: 1-6-20"

followed by a notation of "12/30/19" with someone's initials (Id.).  It is undisputed that during the

intake process, Nea gave information used to fill out the form and signed the Intake Form in three

separate places beneath the following authorizations:

AUTHORIZATION FOR TRANSFER OF CUSTODY OF ANIMAL

> I hereby transfer custody of the animal to Saint Louis County Department of Public
> Health to provide shelter and care, then adopt, transfer, field release, euthanize, or
> otherwise dispose of under provisions of Ordinance Chapter 611.   To my
> knowledge, no person has been bitten by this animal within the past 10 days.

AUTHORIZATION FOR RELINQUISHMENT<br>OF RIGHTS TO OWNED ANIMAL

> I, as the owner or custodian of the below described animal, hereby irrevocably
> relinquish ownership to Saint Louis County Animal Care & Control.  I understand
> that the animal immediately becomes sole property of Animal Care & Control to
> adopt, transfer, field release, euthanize, or otherwise dispose of the animal at the
> sole discretion of Animal Care & Control.  To my knowledge, no person has been
> bitten by this animal within the past 10 days.  I understand that Animal Care &
> Control is under no obligation to return or adopt the animal to me at any time.

AUTHORIZATION FOR RELINQUISHMENT<br>OF RIGHTS TO OWNED ANIMAL FOR PURPOSE OF EUTHANASIA

> I, as the owner or custodian of the described animal, hereby irrevocably relinquish
> ownership to Saint Louis County Animal Care & Control.  I understand that the
> animal immediately becomes sole property of Animal Care & Control for the
> purpose of euthanasia and disposal of the animal.  To my knowledge, no person has
> been bitten by this animal within the past 10 days.

(DF ¶ 35; Doc. 127-1, pp. 12-14).

In addition, a box next to "(ORE) OWNER REQUESTS EUTHANASIA Not Mandatory for

Surrender" was checked (Doc. 127-8, p. 1).  Nea could see and read the form, was not rushed

through the form, and understood the language of the authorizations (DF ¶ 36).  However, he

merely glanced at the form, did not read the form and thought he was just signing the form to put

Daisy into a 10-day quarantine (Doc. 127-1, pp. 12-13).  In addition to the Intake Form, a Bite

Form was filled out noting that there was a minor victim who was taken to the hospital after having been bit by Daisy (Doc. 127-8, p. 3).

At the time that Hawkins filled out the form, she knew that Daisy had bit someone, contrary to the last line in the above authorizations and the Bite Form (PF ¶ 82; Doc. 127-4, p. 29).  In addition, Hawkins notated on the Intake Form that Daisy's quarantine end date would be January 6, 2020 (PF ¶ 76).  She also noted that Daisy would be in kennel "706" which is ACC's quarantine room (PF ¶¶ 71, 72).  The Bite Form contained similar identifying information and indicated that quarantine would end on January 6, 2020 (Doc. 127-8, p. 3).

Neither Dr. Duris nor Dr. Wagenknecht reviewed the Intake Form (WDF ¶¶ 14, 15).

**ACC Policies**

In an ACC chart entitled "Euthanasia Request and Outcome by Intake Date Between 1/1/2015 and 4/3/2021," 1450[11] animals are listed as being an "intake type" of "BITE"[12] (Doc. 129-5).  The chart indicates the animal type (mostly dog or cat); intake date; an intake type of "BITE"; whether the animal is a stray, surrendered by the owner, or claimed by the owner; an "outcome date"; and whether the animal was euthanized, returned to the owner or a rescue group, adopted, "disposal," or "transfer."  A brief review of the document indicates that most animals taken in were dogs, over half were eventually euthanized, and the remainder were mostly either returned to an owner or adopted.  There is no synopsis of this chart, no analysis by an expert, or any testimony regarding it.[13]  Nonetheless, Plaintiff claims that ACC euthanized 6 dogs (excluding

---

[11] In this 25-page document, there appears to be 60 animals listed on each page except the first and last pages.  On the first page, there are 56 animals listed and on the last page, there are 14 animals listed.  If the Court's calculations are correct, (23x60) + 56 +14 = 1,450.  Notwithstanding the title, the first "intake date" is 12/24/15.

[12] Plaintiff indicates that this list contains "1402 dogs as bite cases, excluding Daisy" from the time period 1/1/15 to 12/31/19 (PF 24).  Plaintiff does not explain how she came up with this number.

[13] In her Statement of Uncontroverted Material Facts (Doc. 129), Plaintiff states that she attempted to depose a County representative by serving a notice of deposition on April 29, 2022, but was unsuccessful due to Defendants' refusal to

Daisy) prior to the expiration of a 10-day quarantine period with one being euthanized for health reasons and another for age reasons (PF ¶¶ 24 and 25).

ACC's 2015 Employee Handbook describes standard operating procedures (Doc. 129-2).[14] It is undisputed that each of Defendants is familiar with the Handbook.  The Handbook refers to "Hold Time" – which is the length of time an animal is required to be held under ACC's care depending on the circumstances of ACC's acquisition of the animal (Doc. 129-2, p. 2).  For animals that are owned and that have bitten a human, the Hold Time is 1-10 calendar days and for animals that are owned and that the owner surrenders, the Hold Time is 0 days (Doc. 129-2, p. 3).  Hold Times generally begin the same day or a day after the animal is impounded (Id.).  The period after the Hold Time expires is the "Due Out Date."  (Id.).  At that point, the Handbook indicates the animal becomes the "property of St. Louis County."  Thus, owned animals that bite a human "have a Hold Time that corresponds with their bite quarantine – the last day of the quarantine is the Due Out date" and owned animals that are "surrendered by an owner are instantaneously 'Due Out' and have NO hold time; their Due Out date and time must MATCH their Intake date and time (Id. 2-3 (emphasis in original)).  When determining the ownership of an animal, employees go through an 8-step hierarchy of proof beginning with microchip information (determining whether the ID of the person with the animal matches the name provided by the microchip), including ID tags, and ending with the dog's reaction (i.e. whether the dog acts like the person is its owner) (Id. 4).

On December 27, 2019 at 11:28 a.m., Mandy Ryan, ACC's Animal Population Manager, emailed Dr. Duris and Leanderas Jackson stating:

---

produce the witness (Doc. 129, p. 4 n.1).  The various discovery disputes in this case were dealt with by separate Order and a footnote in a document related to summary judgment is insufficient to raise a discovery dispute.  It is sufficient to note that Plaintiff has not provided any additional evidence related to this chart, did not file a Rule 56(d) motion, and has had ample opportunity to conduct discovery.

[14] Plaintiff only provides portions of the Employee Handbook.

> I would like to propose that the euthanasia lists no longer rest on Becky [Rainwater] or Maryanne [Willis]. If they have recommendations, can they send them to me then I can send my final recommendations to you?  I would like to stay in the loop and make the final decision on euth lists with the two of you . . . .  More than once now I've seen animals recommended for euthanasia for behavior that should not be on the list at all, and animals that should have been on the list haven't been . . . .

(Doc. 129-12, p. 1).

Dr. Duris agreed that Rainwater and Willis can "certainly recommend" but that she, Ryan, and Jackson should make final decisions (Id.).  At 11:56 a.m., Duris permitted Ryan to tell Rainwater and Willis to send their recommendations to her (Id) which she did a few minutes later telling them that they should tell her their recommendations for the "euthanasia lists."  (Doc. 129-11, p. 1).  It is unclear what the import of these emails are –the cited deposition references do not explain these emails or what "euthanasia lists" entail.[15]  It is further unclear how this email relates to Daisy or whether Rainwater or Willis were aware of the email prior to their interaction with Nea.[16]

Around 10% of the animals taken in by ACC are "bite cases" which is equivalent to about 500 animals per year (Doc. 127-7, p. 69).  In those cases, owners signed forms which none-the-less indicated that the animal was not involved in a bite (Doc. 127-7, p. 69).[17]  More than a thousand people signed such forms.  In June 2019, prior to the incident with Daisy, an audit and personal investigation by Spring Schmidt, ACC's former director, was conducted in which St. Louis County

---

[15] Plaintiff cites to Dr. Duris' deposition at page 231, lines 12-21.  That page does not reference actual testimony, only questions and objections (Doc. 129-19, p. 6).

[16] In her statement of uncontroverted facts, Plaintiff refers to events that occurred after Daisy's euthanasia (PF ¶¶ 152-155).  A portion of these statements are redacted, in contravention of Local Rules, and Plaintiff has not provided an unredacted version.  As such, the Court will not consider these statements.  In any event, PF ¶¶ 152 and 153 refer to "Ex. 23," which is Dr. Wagenknecht's deposition (Doc. 129-22), but which does not appear to contain the quoted language.  The reference to Dr. Duris' deposition section to support PF ¶¶ 154 and 155, is equally problematic.  The citation only refers to a question by counsel (and not the answer), does not support the factual statements made by Plaintiff, is not placed in any type of context, and simply does not support PF ¶ 155 at all.

[17] The Court assumes that Dr. Duris was testifying that the "bite" involved an animal biting a human as oppose to another animal.  The Court further assumes that Dr. Duris was referring to the Intake Form.

was accused of "misleading residents into checking the ORE box" for a period of time since 2018 (Doc. 203-8, pp. 50-51). Ms. Schmidt formally stopped the policy and was unaware of any further allegations that the former policy was being followed (except as to this case) (Doc. 203-8, p. 50-51).

**Daisy's Microchip**

Plaintiff states: "HomeAgain verified that Daisy's microchip was registered to Plaintiff Bulfin (misidentified in HomeAgain's records as 'Erin Nea'). [Ex. 4, 10, 20; Ex. 21, *Depo of M. Willis*, 169:9-12]." This statement is misleading at best and patently false at worst. Exhibit 4 is the Intake Form in which it is notated that the "chip traced – Erin Nea" at the same address as Edward Nea (Doc. 129-4). Exhibit 10 is a printout from HomeAgain. This document contains a curious set of information. As of February 22, 2022, the "Microchip is currently enrolled" to Erin Bulfin (at the same address as Edward Nea) (Doc. 129-9, p. 1). On page 2 of the document, there is a notation at the bottom that: "Update Received through Standard Interface on 23-Mar-20. Changed Owner's Last name to BULFIN  Ownership Transfers: None." (Doc. 129-9, p. 2). On page 4 of the document, the first "contact center history" of the microchip indicates that on March 15, 2014 the microchip was "enrolled at that point to: Erin Nea . . ." (with the same relevant address) with further references to "Erin Nea" thereafter (Doc. 129-9, p. 4). The record reflects that Plaintiff updated the ownership information for the microchip <u>after</u> Daisy died – there was no "misidentification" in the record.   In her deposition, Willis indicated that when she ran the microchip she received a "match" as to the last name on the Intake Form (Doc. 181-6, p. 3-4).[18]

---

[18] In PF 125, Plaintiff refers to page 162 of Willis' deposition but has not provided that portion of her deposition.

### III.   <u>Standard</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under Rule 56, a party moving for summary judgment bears the burden of demonstrating that no genuine issue exists as to any material fact.  See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Once the moving party discharges this burden, the non-moving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." <u>Anderson</u>, 477 U.S. at 247.  The non-moving party may not rest upon mere allegations or denials in the pleadings. <u>Id.</u> at 256.  "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. <u>Id.</u> at 248.

The Court must construe all facts and evidence in the light most favorable to the non-movant, must refrain from making credibility determinations and weighing the evidence, and must draw all legitimate inferences in favor of the non-movant. <u>Id.</u> at 255. "Where parties file cross-motions for summary judgment, each summary judgment motion must be evaluated independently to determine whether a genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law." <u>Progressive Cas. Ins. Co. v. Morton</u>, 140 F. Supp. 3d 856, 860 (E.D. Mo. 2015) (citations omitted).

IV.   **Discussion**

As noted above, Plaintiff is proceeding on her Fourth Amendment claims, state law claims of malicious trespass to personalty, veterinary malpractice, conversion, and negligent infliction of emotional distress, unlawful practice/procedure and failure to train/supervise claims.  Regarding her Fourth Amendment claim, Defendants argue that there is no evidence to support this claim and that they are entitled to qualified immunity.  Likewise, Defendants argue that Plaintiff's state law claims are unsupported by the record and that they are entitled to official immunity.  Finally, they argue that Plaintiff's Monell claims fail on the merits and because there is no individual liability. In her motion, Plaintiff argues that she is entitled to judgment on her Fourth Amendment claim because the County Defendants did not seek or receive her permission to euthanize Daisy thereby interfering with her possessory interests.

If the facts are drawn in a light most favorable to Plaintiff, as they must be at this stage of the proceedings, the evidence reveals that Plaintiff called ACC after the biting incident and discussed quarantine and, to a limited extent, euthanasia with Rainwater.  She also told Rainwater that her husband Edward Nea would be coming to the shelter with Daisy.  Nea then arrived at the shelter within a few hours, talked to Hawkins about quarantining Daisy, but nonetheless signed forms relinquishing ownership interest in Daisy and authorizing her euthanasia.  He then voluntarily surrendered Daisy to Wall who brought her into the shelter.  Upon Rainwater's request and with the approval of Dr. Duris, Dr. Wagenknecht and Willis euthanized Daisy.  Neither Rainwater, Dr. Duris, Dr. Wagenknecht, nor Willis had any direct contact with Nea; and, only Rainwater had any contact with Plaintiff.

A.      **Fourth Amendment Unreasonable Seizure (Counts I, VI, XI, XVI)[19]**

Plaintiff alleges 42 U.S.C. § 1983 claims[20] that the County Defendants violated her Fourth Amendment right against unreasonable seizure by euthanizing Daisy.  "A dog is considered property for Fourth Amendment purposes." Andrews v. City of West Branch, Iowa, 454 F.3d 914, 918 (8th Cir. 2006); See also LeMay v. Mays, 18 F.4th 283, 287 (8th Cir. 2021) ("Privately-owned dogs are 'effects' under the Fourth Amendment.").  A Fourth Amendment seizure occurs when there is "some meaningful interference with an individual's possessory interests in that property." United States v. Jacobson, 466 U.S. 109, 113 (1984) (quotation marks and citations omitted); Lesher v. Reed, 12 F.3d 148, 150 (8th Cir. 1994).  A Fourth Amendment violation occurs when that seizure is unreasonable.  Hawkins v. City of Farmington, 189 F.3d 695, 702 (8th Cir. 1999); Heien v. North Carolina, 574 U.S. 54, 60-61 (2014) (reaffirming that the ultimate touchstone of the Fourth Amendment is reasonableness).  In addition to showing an unreasonable seizure, Plaintiff must demonstrate "each individual defendant's personal involvement in the alleged violation." White v. Jackson, 865 F.3d 1064, 1081 (8th Cir. 2017).

---

[19] As mentioned in Footnote 1, supra, Plaintiff's constitutional claim is limited to an unreasonable seizure claim in violation of the Fourth Amendment.  She does not mention "due process" at all in her Complaint and therefore makes no such independant due process claim.  In her partial motion for summary judgment on her constitutional claims (Docs. 128 and 130), she only argues that the facts support an unreasonable seizure claim.  In their motion, however, Defendants inexplicably argue that Plaintiff cannot make out a procedural or substantive due process claim, (Doc. 126, pp 10-11), to which Plaintiff responds (Doc. 206, pp. 30-32).  No stand-alone due process claim was raised in Plaintiff's complaint and one cannot now be raised in response to a motion for summary judgment.  The Eighth Circuit has held that parties cannot "manufacture claims, which were not pled, late in the litigation for the purpose of avoiding summary judgment." N. States Power Co. v. Fed. Transit Admin., 358 F.3d 1050, 1057 (8th Cir. 2004); see, e.g., Clemons v. City of Minneapolis, 2007 WL 1202331, at 6 n.16 (D. Minn. 2007) (First Amendment claim that "is nowhere mentioned" in plaintiff's complaint would not be considered on summary judgment).  And, this Court is not required to permit unpled claims at this stage of the proceedings.  See Gregory v. Dillard's, Inc., 565 F.3d 464, 473 (8th Cir. 2009) (stating that the court "is not required to divine the litigant's intent and create claims that are not clearly raised, . . . and it need not conjure up unpled allegations to save a complaint."); Stone v. Henry, 364 F.3d 912, 914-15 (8th Cir. 2004) (federal courts are not required to 'assume facts that are not alleged, just because an additional factual allegation would have formed a stronger complaint.").  Accordingly, the Court will not address any supposed due process claim that Plaintiff could have alleged but did not.

[20] "Section 1983 provides a mechanism by which aggrieved plaintiffs may sue a state actor for violation of their constitutional rights." Waters v. Madson, 921 F.3d 725, 734 (8th Cir. 2019).  There is no dispute that Defendants are state actors.

### 1.      Unreasonable Seizure

A central theme throughout Plaintiff's arguments is that Daisy was exclusively her dog and that no other person had any authority to dispossess her of her property, including her husband. Thus, Plaintiff claims that the seizure was unreasonable because Nea did not have any authority to request or allow Daisy's euthanasia – that her permission was required as Daisy's owner (Doc. 130).  Plaintiff's argument defies reason, common sense, and case law.  In the Fourth Amendment context, it is black letter law that actual or exclusive possession of an object seized is unnecessary to confer consent to seize.  Put another way, any person reasonably believed to have actual or apparent authority over an item can consent to its search and/or seizure.  United States v. Matlock, 415 U.S. 164, 169-172 (1974); United States v. Beasley, 688 F.3d 523, 50 (8th Cir. 2012); see also Fernandez v. California, 571 U.S. 292, 294 (2014) ("Our cases firmly establish that police officers may search jointly occupied premises if one of the occupant's consents."); United States v. Williams, 36 F.4th 792, 795-796 (8th Cir. 2022) (holding, with respect to a search, that "consent is an exception to the warrant requirement, which may be given by a third party with common authority or apparent authority over the premises or effect").  "Apparent authority exists when the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises."  United States v. Lindsey, 702 F.3d 1092, 1096 (8th Cir. 2013) (internal quotation marks and citations omitted); see also United States v. Amratiel, 622 F.3d 914, 915–16 (8th Cir. 2010).

In this case, Plaintiff called ACC and discussed quarantine and briefly euthanasia with Rainwater.  She also told Rainwater that Nea, her husband, would bring Daisy to ACC.  While at ACC, Nea discussed the incident in question, quarantine, and signed paperwork attesting to his ownership of Daisy.  When Willis checked Daisy's microchip, she saw that "Erin Nea" was listed

with the same address as Edward Nea.[21]  Nea also freely turned Daisy over to ACC employee Wall

and there is no evidence that he indicated that he did not have authority to do so.[22]  There were no

obvious "signals" that Nea only had "limited authority" over Daisy.[23]  Williams, 36 F.4th at 796;

United States v. Langenberg, __ F.4th __, 2022 WL 16704943 (8th Cir. 2022).  It was reasonable

for Defendants to assume that Nea had actual authority over Daisy based on the circumstances of

this case.  As such, no jury would find that Nea did not have common and actual, or at the very

least apparent, authority over Daisy, and Plaintiff has pointed to no case authority that would

require her particular consent under the Fourth Amendment.  See Matlock, 415 U.S. at 170

("[M]ore recent authority here clearly indicates that the consent of one who possesses common

---

[21] Plaintiff's repeated and persistent claim that the scan of the microchip revealed a "mismatch" is without merit.  Any reasonable person would see the same last name on the microchip and Nea's driving license and assume that they were a married couple residing together with their dog.  It further appears that Plaintiff did not change her last name with HomeAgain (to Bulfin) until *after* Daisy was euthanized and only a few months prior to filing her lawsuit.  Thus, it is reasonable to conclude that Plaintiff changed her last name with HomeAgain simply to bolster and support her Fourth Amendment Claims.

[22] The Court further notes that Plaintiff confirmed Nea's authority by telling Rainwater that he would be bringing Daisy to ACC; and, she made no attempt to retrieve Daisy from ACC, immediately upon learning that Nea had taken her there and left her there, until the next morning when she determined that Daisy could quarantine at home.  Nor is there any evidence that she limited (or even commented upon) Edward Nea's authority with respect to Daisy when she spoke to Rainwater.  It goes without saying that it is reasonable for a person to believe that a husband and wife speak with common authority and that the dog was a family pet, not exclusively property of just the wife.

[23] While it is unnecessary to comment on Missouri state laws regarding ownership, Defendants point out that Daisy would be considered marital property.  Marital property is defined by Section 452.330 as:

> [A]ll property acquired by either spouse subsequent to the marriage *except*:
>
> 1. Property acquired by gift, bequest, devise, or descent;
> 2. Property acquired in exchange for property acquired prior to marriage or in exchange for property acquired by gift, bequest, devise, or descent;
> 3. Property acquired by a spouse after a decree of legal separation;
> 4. Property excluded by valid written agreement of the parties; and
> 5. The increase in value of property acquired prior to the marriage or pursuant to subdivisions (1) to (4) of this subsection, unless marital assets including labor, have contributed to such increases and then only to the extent of such contributions.

> [Emphasis added.]  Short v. Short, 356 S.W.3d 235, 242 (Mo. Ct. App. 2011).

It is undisputed that Daisy was acquired subsequent to marriage and none of the above exceptions apply.

authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared."). Therefore, for purposes of Plaintiff's Fourth Amendment claim, Plaintiff is bound by Nea's actions.[24]

When Nea arrived at ACC with Daisy, there was no duress, no show of force, and no compunction that he leave Daisy at ACC; it is clear from the evidence that Daisy was voluntarily surrendered. Williams, 36 F.4th at 795 (holding, with respect to a search, that "consent is an exception to the warrant requirement, which may be given by a third party with common authority or apparent authority over the premises or effect"). No seizure occurred at that point. See United States v. Va Lerie, 424 F.3d 694, 702 (8th Cir. 2005) ("[N]ot every governmental interference with a person's property constitutes a seizure of that property under the Constitution."). Recognizing this fact, Plaintiff argues that Daisy was seized when she was euthanized without consent. United States v. Jacobson, 466 U.S. at 124 ("[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'"). Defendants argue, however, that no seizure occurred because Nea had relinquished ownership of Daisy when he signed the Intake Form. However, Plaintiff's possessory interest in Daisy may not have been extinguished by Nea's actions. See Lesher, 12 F.3d at 150 (stating that a person's right against unreasonable seizures "is not vitiated merely because" the defendants believe the property belongs to another); but see Maryland v. Macon, 472 U.S. 463 (1984) (finding that a defendant had no possessory interest in an item sold to another); Thompson v. Whitman, 85 U.S. (18 Wall.)

---

[24] Plaintiff nonetheless argues that Defendant's behaved unreasonably because Nea's actions did not extinguish her individual property interest in Daisy and cites to Dixon v. Lowry, 302 F.3d 857, 864 (8th Cir. 2002), in support. Dixon, and its reference to a bundle of sticks, does not apply because unlike in Dixon, there is no evidence in this case that any Defendant was aware of any dispute, for lack of a better term, as to the ownership of Daisy or Nea's authority to determine her fate.

457, 471 (1873) ("A seizure is a single act, and not a continuous fact."); Fox v. Van Oosterum, 176 F.3d 342, 351 (6th Cir. 1999) (holding that the Fourth Amendment protects the interest in retaining possession of property "but not the interest in regaining possession of property").[25]

Assuming, then, that the euthanasia itself constituted the seizure, Plaintiff must demonstrate that the seizure was unreasonable.  Defendants argue that the seizure was not unreasonable because Nea voluntarily brought Daisy to ACC, relinquished ownership and control over Daisy through the Intake Form, and consented to Daisy's euthanasia.  They argue that under the "totality of circumstances" and without considering Defendants' motivations, they "simply complied with [ ] Nea's request." (Doc. 126, p. 10).  See LeMay, 18 F.4th at 287 ("The reasonableness of an officer's actions must be judged from the perspective of a reasonable officer, it does not turn on the subjective intent of the officer." (quotation marks, editing marks and citation omitted)).  Plaintiff, on the other hand, makes a number of arguments, including that the seizure was per se unreasonable because there was no related warrant.

To the extent that any party argues that the seizure was unreasonable because Defendants followed or failed to follow state statute, county ordinances, or ACC policies, such arguments fail. As a general matter, compliance (or not) with state or local rules has no bearing on whether Defendants acted consistent with the Fourth Amendment.  See Johnson v. Phillips, 664 F.3d 232, 238 (8th Cir. 2011); Reform Am. v. City of Detroit, 37 F.4th 1138, 1155 (6th Cir. 2011); United States v. Simon, 937 F.3d 820, 835 (7th Cir. 2019).[26]  Accordingly, the only issue is whether Daisy

---

[25] The Fox Court went on to state that its holding does not address "whether a 'seizure' occurs when a person voluntarily gives a thing to a state actor, then asks the state actor to return that thing, and the state actor refuses to do so." Id. at 351.

[26] In any event, Defendants complied with the relevant statute. St Louis' Animal Control Code provides that the Director "shall have the power to impound dogs" when a "person responsible has voluntarily and intentionally relinquished control to the Director."  ST. LOUIS COUNTY, MO. REV. ORDINANCES tit. VI, ch. 611, § 611.090(1)(k) (2018).  A "person responsible" "includes any person . . .  which owns, harbors, shelters, keeps, controls, manages, possesses, or has a part interest in any animal.  An occupant of any premises on which a dog or cat remains or

was unreasonably seized within the meaning of the Fourth Amendment.  See Virginia v. Moore,

553 U.S. 164, 172 (2008) ("We thought it obvious that the Fourth Amendment's meaning did not

change with local law enforcement practices—even practices set by rule. While those practices

vary from place to place and from time to time, Fourth Amendment protections are not so variable

and cannot be made to turn upon such trivialities." (quotation marks and citations omitted)).

---

customarily returns is a person responsible for it under this chapter.  There may be more than one (1) person responsible for an animal."   Id. § 611.040(16).  The Ordinance further provides that no animal will be euthanized within 24 hours of impoundment, except that "[e]very animal whose person responsible has relinquished control of the animal to the County Animal Control Shelter and requests that it be euthanized, may be immediately euthanized." Id. §611.090(7)(b).  Nea was a person responsible who, arguably at least, relinquished control of Daisy for the purposes of euthanasia.

Plaintiff points out, however, that Missouri Statute and other ordinances may have required ACC to quarantine Daisy instead of and/or prior to euthanizing her.  Missouri statute provides that the county commission may adopt rules "which shall include provisions for licensing, catching, impounding, confinement, redemption and isolation and destruction of dogs" for the purposes of promoting health and safety and prevent the spread of rabies. Mo. Rev. Stat. § 322.090.  As Plaintiff points out, St. Louis County Ordinance § 611.140(1) states that "any dog . . . which has bitten a human, shall be confined for a clinical observation period of ten (10) days . . ."  Plaintiff argues that the "shall" in § 611.140(1) supersedes the "may" language in §611.090(7)(b).

When interpreting state ordinances, this Court applies Missouri's rules of statutory construction.  Behlmann v. Century Sur. Co., 794 F.3d 960, 963 (8th Cir. 2015).

> In Missouri, the 'primary rule of statutory interpretation is to give effect to the General Assembly's intent as reflected in the plain language of the statute at issue.  This Court looks to canons of statutory interpretation only when the meaning of a statute is ambiguous or would lead to an illogical result that defeats the purpose of the legislation.  This Court interprets statutes in a way that is not hyper-technical, but instead, is reasonable and logical and give meaning to the statute.'

> Id. (quoting Ben Hur Steel Worx, LLC v. Dir. of Revenue, 452 S.W.3d 624, 626 (Mo. 2015)).

To support her argument, Plaintiff relies on Audio Odyssey Ltd. v. United States, 255 F.3d 512 (8th Cir. 2001) for the proposition that: "In interpreting ordinances, the terms 'shall,' 'will,' and 'must' are indicative of mandatory duties, while may is indicative of merely discretionary powers." (Doc. 206, p. 24).  Plaintiff misquotes and misapplies the case.  Audio Odyssey does not stand for the general proposition advocated by Plaintiff.  Instead, the case narrowly focuses on whether there was a waiver of sovereign immunity for purposes of the Federal Tort Claims Act.  In any event, it is not unreasonable to conclude that the term shall requires action whereas the word may only suggests it. See, e.g., Pelopidas, LLC v. Keller, 633 S.W.3d 383, 396 (Mo. App. Ct. 2021) (interpreting shall and may in a contract).  In the context of the ordinance, however, both sections 611.090(7)(b) and 611.140.1 can be read together. See, e.g. State ex. Rel. Robison v. Lindley-Myers, 551 S.W.3d 468, 474 (Mo. 2018).  The County is required to quarantine an animal suspected of having or transmitting rabies to a person through a bite.  However, the ordinance also allows the County to impound an animal for a variety or other reasons including those animals with no tags, dangerous animals, and those "[a]nimals whose person responsible has voluntarily and intentionally relinquished control to the Director."  St. Louis County, Mo. Rev. Ordinances tit. VI, ch. 611, § 611.090(1)(k) (2018).  In such circumstances, the County is not required to expend resources to impound the animal for 10 days but may euthanize the animal at a responsible person's request.  The two sections of the ordinance are not in conflict or ambiguous.  Both sections balance the need of the County to promote health and safety and the needs of an individual in managing his/her animal.  This conclusion is further consistent with ACC's Employee Handbook indicating that an animal surrendered by an owner has no hold time (Doc. 129-2, p. 3).

While the Supreme Court has recognized that the Fourth Amendment applies in civil contexts, Soldal v. Cook County, Illinois, 506 U.S. 56, 67 (1992), Plaintiff has pointed to no case authority that suggests that non-law enforcement state employees are required to secure a warrant prior to accepting property in these circumstances. It is undisputed that Nea voluntarily gave Daisy to an ACC employee and there is no evidence that any Defendant forced him to do so. At this point in the analysis, it is important to acknowledge that liability under § 1983 requires personal involvement. As set forth above, the touchstone of a Fourth Amendment violation is reasonableness. Furlow v. Belmar, __ F.4th __, 2022 WL 16559232, *4 (8th Cir. 2022). As such, Plaintiff must demonstrate that each individual Defendant acted unreasonably in Daisy's euthanasia in order to hold that Defendant liable. "To assess the reasonableness of this conduct, we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Jacobson, 466 U.S. at 125 (citation and quotation marks excluded).

It is undisputed that Nea signed the Intake Form relinquishing a possessory interest in Daisy and requesting that Daisy be euthanized. Moreover, it is undisputed that Nea was under no disability or duress that prevented him from reading and viewing the contents of the Intake Form or understanding the words written on the Intake Form. On the one hand, then, Nea gave permission for Daisy's euthanasia. However, there is also competing evidence that Nea intended to request quarantine, that Hawkins understood that he requested quarantine by filling out certain portions of the forms, and that Plaintiff herself did not request that Daisy be euthanized (with the caveat that she made no request regarding Daisy's disposition). Such questions of fact would typically preclude summary judgment. In this case, however, they do not because each Defendant can only be held liable for their own conduct, which no jury would find to be unreasonable even

based on Plaintiff's version of events.   Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("[b]ecause vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Beaulieu v. Ludeman, 690 F.3d 1017, 1030 (8th Cir. 2012).

As to Hawkins, there is no evidence that she was involved in the decision to euthanize Daisy; that is, there is no evidence that she physically or otherwise unreasonably seized Daisy, or that she had any authority to euthanize Daisy.  Hawkins did not have physical control over Daisy nor was she able to request or require that she be euthanized.  Plaintiff presents evidence that she filled out the Intake Form which contained competing and contrary information.  But, for her part, Hawkins noted on the Intake Form that Daisy's quarantine end date would be January 6, 2020, she assigned Daisy to the quarantine room, and she expressed to her supervisor that she believed that Daisy should be quarantined.  Viewing the facts in the light most favorable to Plaintiff, the most she has shown is that Hawkins erred or was negligent in filling out paperwork, which may or may not give rise to a legal claim, but which does not rise to the level of a constitutional violation.  See Daniels v. Williams, 474 U.S. 327, 328 (1986) ("We conclude that the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." (emphasis in original)).  Therefore, no reasonable jury would find that Hawkins violated Plaintiff's constitutional rights.

As to the other Defendants, in United States v. Sanchez, 32 F.3d 1330 (8th Cir. 1994), the Court considered a scenario where a Spanish-speaking defendant was found to have consented to a search verbalized by an English-speaking police officer and after signing a consent form written in English.  He argued that he could not have given consent because he did not understand the officer and could not read the consent form.  The Court held that, despite the defendant's lack of

understanding, "the search may be upheld on the ground that [the police officer] reasonably believed that [the defendant] voluntarily consented to the search" even if that determination is incorrect. Id. at 1333, 1335. In this case, the only information that Rainwater had was a phone call from Plaintiff indicating that a dog had bitten a child and that a husband would be bringing the dog to ACC for what Rainwater assumed was quarantine. When Nea arrived at ACC, regardless of what he may have verbally explained to Hawkins, he signed paperwork requesting that Daisy be euthanized.[27] Plaintiff has presented no credible evidence that it was unreasonable for Rainwater to rely on that paperwork. Armed with that paperwork requesting euthanasia, knowledge that Daisy had bit a child (requiring medical attention), and the imprimatur of local ordinance,[28] Rainwater asked Dr. Wagenknecht to perform the euthanasia. The only information that Dr. Wagenknecht, Dr. Duris, and Willis had was that an owner requested euthanasia in a "bite case" because that is what Rainwater believed and what she relayed to them. On these set of facts, no jury would find that it was unreasonable for each of these Defendants to conclude that there was consent to euthanize Daisy, thus rendering their actions reasonable within the meaning of the Fourth Amendment.

Plaintiff nonetheless argues that each of these Defendants are culpable because they should have done something more to verify Daisy's ownership or the requested euthanasia. Of course, euthanizing a family pet is an irreversible step and perhaps it would have made sense for someone to double or triple check that it was what an owner wanted. But the Constitution does not demand such correctness. Again, viewing the facts in the light most favorable to Plaintiff, Defendants'

---

[27] As noted above, Rainwater testified that she also talked to Nea about Daisy and that he insisted that Daisy be euthanized. Nea does not state that this was not the content of the conversation but instead denies that the conversation ever occurred. As such, there is a question of fact as to whether Nea spoke to Rainwater. That question is not material because there is no evidence that any Defendant was aware that the information contained in the Intake Form was arguably different than what Nea had verbally indicated to Hawkins.

[28] See Footnote 26 supra.

efforts to verify Daisy's ownership were constitutionally sound.  Plaintiff told Rainwater that her husband – Nea – was bringing Daisy to ACC and why.  Nea did, in fact, bring in Daisy.  Daisy's chip was checked and Daisy was registered to Erin Nea at the same address provided by her husband.  Plaintiff does not allege that she told Rainwater or anyone else that her family had a unique dog ownership in which she alone owned Daisy and made all decisions regarding Daisy.  Finally, and tellingly, someone changed the ownership information for Daisy _after_ she was euthanized.  Thus, accepting for present purposes that Daisy was uniquely owned by Plaintiff, to the exclusion of her husband and other family members, the undisputed facts indicate that Daisy was not registered in any manner that would indicate such exclusive ownership.  Stated differently, if there was a mistake regarding ownership of Daisy, it was a mistake that must be borne by Plaintiff and not Defendants.  Each of these Defendants, according to Plaintiff, only had knowledge that an owner requested that a pet be euthanized and they acted accordingly.   Under these circumstances, no such unreasonable seizure occurred.

### 2.      Qualified Immunity

Qualified immunity is personal defense and must be assessed as to each defendant individually.  March v. Phelps County, 902 F.3d 745, 754 (8th Cir. 2018).  "Qualified immunity shields a government official from suit under § 1983 if his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Kelsay v. Ernst, 933 F.3d 975, 979 (8th Cir. 2019) (citations omitted).  "Qualified immunity analysis requires a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  Morgan v. Robinson, 920 F.3d 521, 523 (8th Cir. 2019) (quotation marks and citations omitted).   The doctrine "protects all but the plainly

incompetent or those who knowingly violate the law." City of Tahlequah, Oklahoma v. Bond, __ U.S. __, 142 S.Ct. 9, 11, (2021).

It is within the Court's discretion to determine which prong of the qualified immunity analysis to address first. Kelsay, 933 F.3d at 979.  The first prong requires an analysis of Plaintiff's constitutional claims against each Defendant.  As to the second prong, a right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Rivas-Villegas v. Cortesluna, __ U.S. __, 142 S.Ct. 4, 7 (2021) (per curiam) (citation omitted).   Although a direct case on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." Id.  In other words, "[i]t is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." City of Tahlequah, Oklahoma, 142 S.Ct. at 11 (considering a Fourth Amendment excessive force claim).

Even if Plaintiff could establish that Defendants violated her Fourth Amendment rights, such a right was not clearly established at the time.  Plaintiff states that "[w]ith respect to dogs and family pets, every circuit that has considered the issue has concluded that the unreasonable killing of a companion dog constitutes a seizure within the meaning of the Fourth Amendment" (Doc. 206, p. 32 (quotation marks, editing marks, and citation omitted)). [29]  To support this position, Plaintiff relies on Viilo v. Eyre, 547 F.3d 7070 (7th Cir. 2008), where police officers shot a dog that posed no immediate danger while attempting to arrest a wanted felon;  Lesher, 12 F.3d 148 (8th Cir. 1994), where police officers physically removed a dog from a home; and, Lemay, 18

---

[29] When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate a violation of her constitutional right and that the right was clearly established at the time.   Kuessner v. Wooten, 987 F.3d 752, 755 (8th Cir. 2021); Snider v. City of Cape Girardeau, 752 F.3d 1149, 1155 (8th Cir. 2014).

F.4th 283 (8th Cir. 2021), where police officers shot two dogs while responding to an inadvertently activated burglar alarm.  Plaintiff's suggestions are misplaced.  There is a vast difference, factually if not legally, between police officers shooting a family pet and animal control employees euthanizing a family pet that has been voluntarily surrendered and for which there is consent to euthanize.  To overcome this difference, Plaintiff cites to Dehjonge v. City of Dearborn, 2021 WL 4894613 (E.D. Mich. 2021).  While Dehjonge is factually similar, an unpublished district court case hardly places a *constitutional* question beyond debate and does not represent a consensus of precedent that clearly establishes a constitutional right.  Kuessner v. Wooten, 987 F.3d 752, 755 (8th Cir. 2021) ("To be clearly established, the contours of the right must be sufficiently clear that a reasonable official would have understood that what he is doing violates that right . . . .  There must be precedent, controlling authority, or a robust consensus of cases of persuasive authority." (quotation marks and citation omitted)).

Just like the general conclusion in Dehjonge, Plaintiff's argument defines clearly established law at a high level of generality which is especially not helpful in a Fourth Amendment context.  See Kinsela v. Hughes, ___ U.S. ___, 138 S.Ct. 1148, 1152-1153 (2018); see, e.g., Hansen v. Black, 872 F.3d 554, 559 (8th Cir. 2017) (while assessing qualified immunity noting that none of the plaintiff's citied cases "involved an unleashed, unsupervised dog[ ] that was risking public safety on a busy interstate highway and would not respond to numerous attempts at a safe, harmless seizure").  Instead, Plaintiff must produce "a controlling case or a robust consensus of cases of persuasive authority" and demonstrate that "existing precedent must have placed the statutory or constitutional question beyond debate." Dillard v. O'Kelley, 961 F.3d 1048, 1052 (8th Cir. 2020) (quotation marks and citations omitted).  Plaintiff has not done so.  See Lombardo v. City of St. Louis, 38 F.4th 684, 690 (8th Cir. 2022) (noting that "[t]he Supreme Court has never

answered the question of whether a right may be clearly established without a Supreme Court case specifically recognizing it").   Plaintiff has not identified, and the Court has not found, any controlling case authority that has held that government officials (i.e., Rainwater, Dr. Duris, Dr. Wagenknecht, and Willis) violate the Fourth Amendment by seizing and destroying an effect with the consent of a person who reasonably has actual or apparent authority.   Indeed, the opposite is true.   See Williams, 36 F.4th at 795 ("Consent is an exception to the warrant requirement, which may be given by a third party with common authority or apparent authority over the premises or effects.") (citing Amratiel, 622 F.3d at 915-916; Matlock, 415 U.S. 164 (1974)).   Nor has Plaintiff presented any case authority that an employee (i.e., Hawkins) with no authority to seize an effect and whose opinion as to the disposition of that effect is overruled by a supervisor, violates clearly established law.   Nea appeared at ACC with Daisy, relayed information regarding Daisy's actions, and signed paperwork consenting to Daisy's euthanasia.   Nea had actual, or at least apparent, authority to consent to Daisy's euthanasia and Defendants Rainwater, Duris, Wagenknecht, and Willis were reasonable in relying on that consent even if they were mistaken.   Plaintiff has pointed to no case authority that would inform Defendants that they were violating any clearly established law.   Therefore, Defendants Hawkins, Rainwater, Dr. Duris, Dr. Wagenknecht, and Willis are entitled to judgment on Plaintiff's Fourth Amendment claims based on qualified immunity.

### B.   Unlawful Pattern, Practice, and/or Custom and Failure to Train/Supervise (Counts XXIX and XXX)

"A corporation acting under color of state law cannot be liable on a respondeat superior theory."   Smith v. Insley's Inc., 499 F.3d 875, 880 (8th Cir. 2007).   Rather, to support a claim against such a corporation or county, the plaintiff "must show that there was a policy, custom, or official action that inflicted an actionable injury."   Johnson v. Hamilton, 452 F.3d 967, 973 (8th Cir. 2006); Mick v. Raines, 883 F.3d 1075, 1079 (8th Cir. 2018); Monell v. Dep't of Social

Services of City of New York, 436 U.S. 658 (1978).  An "official policy" can either be unconstitutional on its face or one that is inadequate based on the deliberate or conscious choices of a decisionmaker.  Szabla v. City of Brooklyn, Minn, 486 F.3d 385, 389 (8th Cir. 2007).  It is a "deliberate choice of a guiding principle or procedure made by the [ ] official who has final authority regarding such matters."  Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999).  To show an unconstitutional custom, plaintiff must demonstrate:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> (3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

Johnson v. Douglas Cty. Med. Dep't, 725 F.3d 825, 828 (8th Cir. 2013).  Finally, plaintiff may show a deliberately indifferent failure to train or supervise by showing a "pattern of similar constitutional violations by untrained employees."  S.M. v. Lincoln County, 874 F.3d 581, 585 (8th Cir. 2017).

The Eighth Circuit has "consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." Mahn v. Jefferson Cty., Missouri, 891 F.3d 1093, 1099–100 (8th Cir. 2018) (citation omitted); see also Granda v. City of St. Louis, 472 F.3d 565, 568 (8th Cir. 2007) ("A claim brought against a municipality under § 1983 is sustainable only if a constitutional violation has been committed pursuant to an official custom, policy, practice or custom of the city.").  According to that general rule, Plaintiff cannot proceed on her Monell claims because there is no individual liability on the underlying Fourth Amendment claim.

The Eighth Circuit has identified a few areas where municipal liability can attach even with no finding of individual liability.  In Kuha v. City of Minnetonka, 365 F.3d 590 (8th Cir. 2003), the Eighth Circuit recognized an exception to the rule stating that "a municipality that operates under a policy or custom that unconstitutionally deprives a citizen of his or her rights may be liable under § 1983. This is true even if the arresting officers are not held responsible because of some good faith belief, meriting qualified immunity." Id. at 603, *abrogated in part on other grounds en banc*, Szabla, 486 F.3d at 395–96.  In Kuha, the Court found that officers were entitled to qualified immunity because, even though they violated plaintiff's constitutional rights, it was not clearly established that their conduct was unlawful.  The Court nonetheless found that plaintiff could proceed on a Monell claim because "'the action that is alleged to be unconstitutional implements or executes'" an official policy.  Kuha, 365 F.3d at 603, quoting Monell, 436 U.S. at 690. Unconstitutional official policies do not require the same attention to causation and culpability that are necessary to establish unconstitutional custom or practice.  Kuha, 365 F.3d 603-6.  Thus, "where . . . the plaintiff points to an allegedly unconstitutional official policy, alleges that municipal employees complied with that policy, and claims that such compliance caused the deprivation of his or her constitutional rights, causation and culpability are not at issue."  Id. at 605-6.  In such a circumstance, an analysis "must proceed under the direct route to Monell liability, which does not require a separate and distinct showing of 'deliberate indifference.'"  Id. at 605. In Kuha, where the Court found that the individual defendants violated plaintiff's Fourth Amendment rights but was entitled to qualified immunity, the plaintiff could still proceed on a claim that official city policy led directly to the constitutional violation.  See also Speer v. City of Wynne, Arkansas, 276 F.3d 980, 986 (8th Cir. 2002); but see McCoy v. City of Monticello, 411

F.3d 920, 922 n. 3 (8th Cir. 2005) (noting that only <u>Kuha</u> represents an exception to the general

rule which applies when no individual liability on the underlying substantive claim is found).

Plaintiff does not mention <u>Kuha</u> or argue that the <u>Kuha</u> exception applies in this case.

However, for completeness, the Court will address Plaintiff's <u>Monell</u> claims.  Plaintiff identifies

the following allegedly unconstitutional official policy and custom:

> 1.  "St. Louis County maintained an official policy of assisting third parties
> in depriving animal owners of their possessory interest in their animal in the
> absence of exigent circumstances and valid consent and without a warrant or
> judicial authorization," namely St. Louis Municipal Code § 611.090.7(b) (Doc.
> 206, p. 38); and,

> 2.  "St. Louis County maintained an unconstitutional practice and custom
> of requiring all owners seeking to temporarily relinquish custody of their animals
> for purpose of a ten-day bite quarantine to sign waivers of their rights and
> irrevocably surrender their animals, even for purposes of bite quarantines, and to
> sign owner-requested euthanasia language authorizing ACC and its employees to
> kill animals at their discretion, even when this was not the intent of the
> 'surrendering' party [sic]" (Doc. 206, p. 39).

Plaintiff first argues that § 611.090.7(b) is unconstitutional, facially and as applied, because

it would allow a broadly defined "person responsible" to dispose of someone's property when they

have no or only some possessory interest in that property.[30]   This claim fails as a matter of law

because Plaintiff has not established that this ordinance was the moving force behind Daisy's

euthanasia: ACC did not euthanize Daisy based on the say so of a "person responsible" but rather

because an owner consented.   In addition, because there are scenarios where the ordinance does

not run afoul of the Fourth Amendment (i.e. an actual owner of an animal is also a "person

responsible"), Plaintiff's facial challenge fails as a matter of law.   See <u>United States v. Salerno</u>,

481 U.S. 739, 745 (1987).

---

[30] Defendants' argument that Plaintiff is precluded from raising this claim in response to summary judgment is without merit.

Plaintiff's "as applied" argument rests on the faulty foundation that Nea did not have authority to consent to Daisy's euthanasia.  Republican Party of Minn., Third Cong. Dist. v. Klobuchar, 381 F.3d 785, 790 (8th Cir. 2004) (an as applied challenge only applies to the party before the Court).  As held above, consent vitiates Plaintiff's Fourth Amendment challenge, therefore Plaintiff cannot show that the ordinance was unconstitutionally applied to her.  See generally, McCullen v. Coakley, 573 U.S. 464, 485 n.4 (2014) (in a different context, stating that "the plaintiff generally cannot prevail on an *as-applied* challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally *applied* to him" (emphasis in original)); Phelps-Roper v. Ricketts, 867 F.3d 883, 896 (8th Cir. 2017) (an as applied challenge requires a showing that the statute is unconstitutional in the manner it was particularly applied to the plaintiff).

As to Plaintiff's practice and custom claim, her own evidence demonstrates that signing the County's form did not result in the widespread dispossessing of family pets.  According to Plaintiff's own statistics, only 5 dogs out of over 1400 over a 5-year span, were euthanized prior to a 10-day quarantine period for reasons unrelated to health or age (PF ¶¶ 24,25).  There is no evidence of how many owners who brought their pets to ACC signed the authorizations that were signed by Nea; and, there is no evidence that any other animal was euthanized without an owner's consent even though they may have signed the authorizations.  There is no evidence that during the relevant time period any supervisor or policymaking official was aware of or approved of the dispossessing of animals.  Instead, Plaintiff presents evidence that these actions were personal and unique to herself – there is no showing that any other owner had their pet euthanized supposedly without their permission.

Plaintiff's failure to train claim also fails as a matter of law for this same reason. Plaintiff has provided no evidence of a "pattern of similar constitutional violations by untrained employees." S.M. v. Lincoln County, 874 F.3d 581, 585 (8th Cir. 2017). The only evidence presented in this case is that ACC *had* a policy of misleading residents into checking the ORE box but that the policy and any related training was ended by Ms. Schmidt prior to Daisy's euthanasia. Plaintiff has pointed to no evidence suggesting that ACC was training employees into misleading residents into checking the ORE box after the change in policy or that simply checking the ORE box led to the euthanization of animals without consent. Moreover, to the extent that she argues that the policy was not in fact changed until the December 27, 2019 emails, such an argument is unsupported by the evidence. Instead, the evidence reveals that ACC followed its SOP with respect to Daisy by noting that there was no Hold Time on an animal surrendered by an owner and whose microchip was checked to confirm ownership. Plaintiff may have found a gun but it was hardly smoking at the time of Daisy's euthanasia.

### C.    State Law Claims

A district court may decline to exercise supplemental jurisdiction over state claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The decision to exercise supplemental jurisdiction after claims over which the Court has original jurisdiction have been dismissed is reviewed for an abuse of discretion. Thompson v. Kanabec County, 958 F.3d 698, 708 (8th Cir. 2020). The Eighth Circuit has stated that "[i]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Barstad v. Murray Cty., 420 F.3d 880, 888 (8th Cir. 2005) (quoting Carnegie-Mellon Univ. v.

Cohill. 484 U.S. 343, 350 n.7 (1988)).  Gregoire v. Class, 236 F.3d 413, 419-20 (8th Cir. 2000)

("When state and federal claims are joined and all federal claims are dismissed on a motion for

summary judgment, the state claims are ordinarily dismissed without prejudice to avoid needless

decisions of state law...as a matter of comity.") (quotation marks omitted).

After consideration of the relevant factors, the Court declines to exercise supplemental

jurisdiction over Plaintiff's remaining state law claims, which involve numerous questions of state

law that would be better determined by the Missouri state courts.  Accordingly, Plaintiff's

remaining state law claims of malicious trespass to personalty, conversion, and negligent infliction

of emotional distress (Counts II, III, V, VII, VIII, X, XII, XIII, XV, XVIII, XX, XXII, XXIV,

XXV), will be dismissed without prejudice. To the extent that the motions for summary judgment

are directed toward the state law claims, they are denied as moot.

**III.** **Conclusion**

The Court is mindful that losing a beloved pet can be devastating to a family.  In this

particular case, however, no reasonable jury would find that Plaintiff's Fourth Amendment rights

were violated when ACC euthanized Daisy.  Even if a jury were to so find, Defendants are entitled

to qualified immunity.

For the foregoing reasons, Defendant Wagenknecht's Motion for Summary Judgment

(Doc. 118) is **GRANTED in part**, the County Defendants' Motion for Summary Judgment (Doc.

125) is **GRANTED in part**, Plaintiff's Motion for Partial Summary Judgment (Doc. 128) is

**DENIED**, and Plaintiff's Motion to Strike (Doc. 201) is **DENIED as moot**:

1.  Judgment is granted in favor of Defendants and against Plaintiff on the Fourth

Amendment unreasonable seizure claims (Counts I, VI, XI, XVI, XXIII), unlawful

practice/policy/custom claim (Count XXIX), and failure to train claim (XXX).

2.   Plaintiff's failure to intervene claim (Count XVII), and state law claims of veterinary malpractice against Defendant Duris (Count XIX) and intentional infliction of emotional distress (Counts IV, IX, XIV, XXI, XXVII) are voluntarily dismissed without prejudice

3.   Plaintiffs remaining state law claims of malicious trespass to personalty (Counts II, VII, XII, XVIII, XXIV), conversion (Counts III, VIII, XIII, XX, XXV), and negligent infliction of emotional distress (Counts V, X, XV, XXII), and veterinary malpractice claim against Defendant Wagenknecht (Count XXVI) are dismissed without prejudice.

The Clerk of Court shall enter judgment accordingly and close this case.


*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 21st day of November, 2022